UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| MILOS TORBICA, <br><br> Plaintiff, <br><br> v. <br><br> HORIZON BANK, <br><br> Defendant. | CAUSE NO. 3:22-CV-20 DRL-MGG |

OPINION AND ORDER

Milos Torbica was a Vice President Mortgage Sales Loan Manager at Horizon Bank. He worked at the bank for six years and in the mortgage loan industry for nearly four decades before he was terminated in 2021. He sued Horizon for employment discrimination based on his age, national origin, and religion in violation of the Age Discrimination in Employment Act (ADEA) and Title VII of the Civil Rights Act. Horizon requests summary judgment today. The court grants the motion.

BACKGROUND

On June 30, 2014, Milos Torbica began working for Horizon Bank in Michigan City, Indiana [29-2 Tr. 21-22, 26]. He was 55 years old [29-2 Tr. 9]. In his job, he acted as a liaison between the sales and operations employees, hired and supervised Mortgage Loan Originators (MLOs), and ensured sales were meeting the bank's expectations in a certain geographic area [29-2 Tr. 35-36, 37]. At the beginning of his employment, Mr. Torbica was responsible for the LaPorte County West geographic area (stretching down to Indianapolis) [29-2 Tr. 36]. His supervisor was Senior Vice President Keene Taylor [29-2 Tr. 27].

During Mr. Tobica's employment, Horizon hired two additional VP Mortgage Sales Loan Managers. In 2015, it rehired Mary Kay Gaboyan, then age 50, to cover the Northeastern Indiana and Michigan geographic area [29-2 Tr. 39, 71-72; 21-1 ¶ 8]. In October 2018, it hired Larry Simmons, then age 51, to cover Lafayette, Indianapolis, and everything south of Indianapolis [29-2 Tr. 39, 72; 29-1 ¶ 9].

Once they were hired, Mr. Torbica's geographic area was adjusted to LaPorte, Porter, and Lake counties [29-2 Tr. 38].

Mr. Torbica was compensated pursuant to a Mortgage Loan Consultant Agreement [29-2 Tr. 27-28]. At the start of his employment, he was paid $80,000 annually (in biweekly installments) plus monthly commissions at a rate of $15 per loan closed for the first 75 loans and $30 per loan thereafter [29-2 Tr. 27-29; 29-2 pdf 58]. In January 2016, Mr. Torbica and Horizon amended his Mortgage Loan Consultant Agreement. The amendment set his annual compensation at $75,000 plus monthly commissions paid at a rate of 1.5 basis points (bps) on the first $100 million and 2.5 bps thereafter based on the sales of the MLOs he supervised [29-2 Tr. 32-34, 37-38; 29-2 pdf 61]. This compensation structure was set by his supervisor, Senior Vice President Taylor, as well as Horizon's President, James Neff [29-2 Tr. 34].

The Senior Vice President (Mr. Taylor and then, starting in 2019, his replacement Noe Najera [29-3 Tr. 12; 31-28 Tr. 21]) also set the compensation structures for the other mortgage sales loan managers [29-2 Tr. 72-73], though they had different structures than Mr. Torbica. Ms. Gaboyan was paid $75,000 base plus 2 bps on the first $100 million and 3 bps thereafter [29-3 Tr. 146; 31-15].[1] Mr. Simmons was paid $75,000 base plus 4 bps on the first $40 million in sales, 6 bps thereafter up to $100 million, and then 10 bps over $100 million [31-20].[2] Mr. Simmons was paid more on less production because he had to build the team in the Indianapolis/Southern Indiana market [29-3 Tr. 134]. Mr. Torbica mentored Mr. Simmons as he was brought on board to take over the central market region [31-28 Tr. 20]. In 2020, after

---

[1] In 2021, Ms. Gaboyan's base increased to $80,000 plus an additional incentive pay metric: 4 bps for sales over 110 percent of her goal sales [31-16].

[2] Horizon says Mr. Simmons's original agreement provided for 40 bps for the first $40 million and 60 bps thereafter up to $100 million, citing to a portion of SVP Najera's deposition [29-3 Tr. 134] and its Exhibit 212 [30 ¶ 21]. Exhibit 212 was not provided to the court. In the transcript, SVP Najera seems to be wrongly interpreting the detailed costs spreadsheet [29-3 pdf 81], which clearly indicates that Mr. Simmons's pay is as described in his 2018 agreement: $75,000 base plus 4 bps on the first $40 million in sales, 6 bps thereafter up to $100 million, and then 10 bps over $100 million. But this fact has no bearing on the court's decision today.

he had built his team, Horizon adjusted Mr. Simmons's pay agreement [29-3 Tr. 134]. The new structure was $75,000 base plus 2 bps on the first $100 million and 3 bps thereafter [31-21].[3]

SVP Najera supervised all three Mortgage Sales Loan Managers beginning July 1, 2019 [29-2 Tr. 48; 29-3 Tr. 13]. When he first assumed the role, SVP Najera didn't have an assistant, so his responses to his employees' emails and requests were sometimes less than timely [31-28 Tr. 95-96], though Mr. Torbica says that Ms. Gaboyan told him that she wasn't experiencing similar issues [31-27 Tr. 67-68]. To enhance communication with his reports, SVP Najera began conducting regular meetings with the three sales managers as well as holding a communications meeting with the sales managers and the operations managers once a week or once every other week [31-27 Tr. 77-79; 29-3 Tr. 55]. On multiple occasions during these meetings, Mr. Torbica spoke about his retirement plans by saying "at age 70, I'll be on the beach." [31-27 Tr. 85; 29-3 Tr. 65-68]. Mr. Torbica planned to retire several years after his son finished graduate school [31-27 Tr. 85]. Mr. Torbica says SVP Najera consistently asked him about his plans to retire, including in front of clients [31-27 Tr. 84-86]. SVP Najera denies this and says he never asked Mr. Torbica or any other Horizon employee when they planned to retire [29-3 Tr. 66].

On March 10, 2020, SVP Najera first raised the possibility of a restructuring to President Neff and Vice President of Human Resources Cindy Pressinell in a memorandum. He said, "I am recommending that [a] current MLO Sales Manager position be eliminated effective immediately" [31-3 at 2]. On this record, there was no response to this memorandum.

Horizon evaluated its sales managers with midyear and annual reviews on several competencies, assigning a point for each competency on a scale from 0 to 5 [29-4 ¶ 5]. To receive an "exceeds expectations" evaluation, the sales manager must earn an overall rating of at least 3.75 points [29-4 ¶ 6]. In 2018 annual and 2019 midyear reviews, both Mr. Torbica and Ms. Gaboyan received a "meets

---

[3] In 2021, his base increased to $80,000 and his incentives changed: 2 bps on the first $60 million, 3 bps thereafter, and 4 bps for sales over 110 percent of his goal sales [31-22].

3

expectations" evaluation [29-4 ¶ 8, 9]. In the 2019 annual reviews, Mr. Torbica again received a "meets expectations" evaluation, whereas Ms. Gaboyan "exceed[ed] expectations" [29-4 ¶ 10].

For the 2020 midyear review, Mr. Torbica again met expectations [29-4 ¶ 11; 31-12] whereas Ms. Gaboyan [31-9] and Mr. Simmons [31-11] both exceeded expectations (receiving 4.29 and 3.83 points respectively). Mr. Torbica claimed an error in this midyear review that caused his overall score to be inaccurate [29-2 Tr. 53-54]. On July 17, 2020, he emailed SVP Najera explaining that the referral category score of 2 (below expectations) was based on an outdated goal as he had fewer MLOs under him after Mr. Simmons came on board whereas the goal was set based on the higher number of MLOs he previously supervised [31-2]. SVP Najera agreed and adjusted this score [31-28 Tr. 117-118].[4]

Mr. Torbica also took issue with his mortgage production and gain on sale scores of 4, as he thought they should have been 5s because "[his] team is on pace to be at or over 200 [percent] of goal in each category" [31-2]. His gain on sale score was adjusted to a 5, but his mortgage production score remained a 4 [31-12 at 5-6]. SVP Najera said that he thought "that 200 percent of goal is overinflated because that includes Mark Ritzi's production in that goal," so he believed that a score of 4 was a fair rating [31-28 Tr. 119]. Mr. Ritzi wore two hats as market president and MLO producer [31-28 Tr. 14], producing about $50 million in 2019 [31-28 Tr. 43; 132].[5] SVP Najera said Mr. Ritzi reported directly to him (and before him, to SVP Taylor), but that Mr. Torbica was "grandfathered in and was allowed to get paid on Mark Ritzi's production, which he provided no support for" [29-3 Tr. 43]. Mr. Torbica says he supervised Mr. Ritzi in part: "My understanding he had a dual role, because he was also named market

---

[4] The parties don't say how it was adjusted, but it seems to have been adjusted to a 3 out of 5, meets expectations [31-12 at 6 "Mortgage Referrals"].

[5] Mr. Torbica says that SVP Najera speculated on Mr. Ritzi's production because at one point in the deposition he said, "I believe Ritzi's numbers in '19 were about $50 million, give or take" [31-28 Tr. 132]. Providing an estimation isn't the same as speculation. Mr. Torbica doesn't explain why the court should consider SVP Najera's repeated testimony that Mr. Ritzi was responsible for $50 million in production as speculative [see also 31-28 Tr. 43 ("Mark Ritzi was $50 million of [Mr. Torbica's] production.")].

vice president, so when he became the mortgage loan originator side of his job he reported to me. When he became market president, he reported to Noe [Najera]" [31-27 Tr. 42; *see also* Tr. 41]. With his mortgage adjustment score remaining at 4 but the other adjustments made, Mr. Torbica's final score for his 2020 midyear review was 3.56 points, met expectations [31-12].

In July 2020, Mr. Torbica asked SVP Najera to adjust his commission structure [29-2 Tr. 76; 29-3 Tr. 157]. SVP Najera discussed this with President Neff, but they ultimately decided not to renegotiate the terms of Mr. Torbica's commission structure [29-3 Tr. 157-159].

Also in July 2020, SVP Najera proposed to President Neff and VP Pressinell that Horizon eliminate two positions—Mike Townsend's position (the producing sales manager in Holland, Michigan) and one of the mortgage sales loan managers—as a cost-saving measure [29-3 Tr. 124, 126]. On October 12, 2020, SVP Najera revised his March 2020 memorandum to President Neff and VP Pressinell outlining his proposal: "In July 2020 I proposed the [elimination of] a Mortgage Loan Producing Sales Manager (Townsend) and the elimination of one Mortgage Loan Sales Manager position. This restructuring will be an immediate cost save to the Mortgage bottom line. Estimated cost savings will exceed $125,000 annually" [31-3 at 2]. "This restructuring will re-align our sales managers; Mary Kay Gaboyan will oversee NWI and Michigan and Larry Simmons Central Indiana. With the elimination of the above mentioned positions and the re-alignment of our Sale Managers, no sales manager will receive an override on Mark Ritz's [sic] (reports to SVP, Retail Lending) production or any CRA production as those three positions will report to the VP, Community Development" [31-3 at 2].

Horizon expected growth in the mortgage loan origination market in Mr. Torbica's territory, but SVP Najera didn't see that growth [29-3 Tr. 48-49]. SVP Najera also thought that Mr. Torbica underperformed in recruiting [29-3 Tr. 49]. In terms of sales, Mr. Torbica was not the top performer. Ms. Gaboyan's team netted approximately $217 million in production in 2019 [29-3 Tr. 132; 31-4 at 4]. Mr. Torbica netted approximately $135 million that year, including Mr. Ritzi's approximate $50 million [29-3

5

Tr. 131-132; 31-4 at 4]. Mr. Simmons netted approximately $53 million that year, his first full year on the job [31-28 Tr. 41; 31-4 at 4].

During the 2020 budgeting process (approximately October through December), SVP Najera reviewed the 2018-2020 production numbers and determined that they remained relatively consistent [31-28 Tr. 23-24, 31-32].[6] With the relatively consistent numbers and the ongoing pandemic, SVP Najera didn't anticipate growth in 2021 and sought to cut costs [31-28 Tr. 31-32]. SVP Najera considered "the overlap of regions, and how [Horizon] could best cover[] and provide coverage to all our retail branches," cost savings, and the potential for growth opportunities in these markets [31-28 Tr. 26]. On the location consideration, SVP Najera determined that Mr. Simmons had been hired specifically to lead the Central/Southern Indiana market and that his position could not be considered for elimination due to his connections with realtors and specific builders in the market [29-3 Tr. 36-37]. So, the decision was between Mr. Torbica's and Ms. Gaboyan's positions. Between the two, SVP Najera thought that the decision was "very, very clear, as far as production and numbers and what they brought to the organization" and that they should keep Ms. Gaboyan's position [31-28 Tr. 65].

SVP Najera recommended that Horizon eliminate Mr. Torbica's position. President Neff, VP Pressinell and CEO Craig Dwight agreed and made the final decision [31-28 Tr. 62]. Mr. Torbica was terminated on January 8, 2021 by elimination of his position [29-2 Tr. 56-57; 31-28 Tr. 105]. He was 61 years old [29-2 Tr. 138-139]. Ms. Gaboyan took over the majority of Mr. Torbica's territory [29-3 Tr. 143]. Mike Townsend (the producing sales manager also mentioned in SVP Najera's October

---

[6] The parties don't clearly provide 2020 midyear production figures. Horizon repeatedly cites to "Najera Dep. Exh. 55," but it doesn't seem to include 2020 figures [29-3 pdf 81]. Horizon also cites to a stray page of SVP Najera's deposition, but it doesn't state clearly whose figures are whose or for what period [29-3 Tr. 136]. The parties don't provide the surrounding pages so the court can attempt to make sense of SVP Najera's testimony. Mr. Torbica's briefing on this point is equally unhelpful. In discussing Ms. Gaboyan's 2020 figures, for example, Mr. Torbica says she "had only $318,753,854 in production as of November 30, 2020 (Ex. 202 at 7)" [33 ¶ 60]. This figure is not for midyear production. The managers' 2020 midyear reviews provide the figures. By midyear 2020, Ms. Gaboyan had $170,343,579 in production [31-9 at 6], Mr. Simmons had $55,800,000 in production [31-11 at 7], and Mr. Torbica had $137,383,281 in production [31-12 at 6].

6

restructuring proposal) was also terminated, though for performance reasons and not restructuring [31-6 at 1]. Mr. Townsend was offered another job at Horizon [31-4 at 3]. Mr. Torbica wasn't.

## STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The non-moving party must present the court with evidence on which a reasonable jury could rely to find in his favor. *Weaver v. Speedway, LLC*, 28 F.4th 816, 820 (7th Cir. 2022). The court must construe all facts in the light most favorable to the non-moving party, viewing all reasonable inferences in that party's favor, *Bigger v. Facebook, Inc.*, 947 F.3d 1043, 1051 (7th Cir. 2020), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003); *see also Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 924-25 (7th Cir. 2020).

In performing its review, the court "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Instead, the "court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Id.* The court must grant a summary judgment motion when no such genuine factual issue—a triable issue—exists under the law. *Luster v. Ill. Dep't of Corr.*, 652 F.3d 726, 731 (7th Cir. 2011).

## DISCUSSION

A. *Age Discrimination.*

The Age Discrimination Employment Act (ADEA) protects workers 40 years of age and older from age-based employment discrimination. *See* 29 U.S.C. § 623(a)(1); *Wrolstad v. Cuna Mut. Ins. Soc'y*, 911 F.3d 450, 454 (7th Cir. 2018). It prohibits the discharge or another adverse employment action "because of such individual's age," 29 U.S.C. § 623(a)(1), but "it does not protect older employees from being fired for legitimate reasons," *Glover v. U.S. Healthworks*, 326 F. Appx. 964, 967 (7th Cir. 2009). Age must be the

but-for cause for the adverse action. *Gross v. FBL Fin. Servs. Inc.*, 557 U.S. 167, 176 (2009). "[I]t's not enough to show that age was *a* motivating factor. The plaintiff must prove that, but for his age, the adverse action would not have occurred." *Marnocha v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 986 F.3d 711, 718 (7th Cir. 2021) (citations and quotations omitted). The law uses a holistic approach that poses a singular question: whether the evidence would permit a reasonable factfinder to conclude that Mr. Torbica's age was the cause of his termination. *See McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 367-68 (7th Cir. 2019). The court considers the evidence as a whole. *Id.*

That said, "the well-known and oft-used *McDonnell Douglas* framework for evaluating discrimination remains an efficient way to organize, present, and assess evidence in discrimination cases." *Johnson v. Advoc. Health & Hosp. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). "There is no magic to this test; it is merely one way of culling the relevant evidence needed to demonstrate whether a reasonable factfinder could conclude that an employer engaged in an adverse employment action based on the plaintiff's race or other proscribed factor." *Johnson*, 892 F.3d at 894.

Under the *McDonnell Douglas* framework, Mr. Torbica must first demonstrate that (1) he is a member of a protected class, (2) he met Horizon's legitimate expectations, (3) he suffered an adverse employment action despite his reasonable performance, and (4) similarly situated employees who were not members of his protected class were treated more favorably. *See McDaniel*, 940 F.3d at 368 (using framework after *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)). If he meets his burden on each element of his *prima facie* case, the burden shifts to Horizon to articulate a legitimate, nondiscriminatory reason for the adverse employment action; and, if Horizon carries that burden, the burden shifts back to Mr. Torbica to submit evidence that Horizon's explanation is pretextual. *Id.*

The law has "long [] recognized that the [*McDonnell Douglas*] test is not inflexible and is appropriately adapted where necessary to reflect more fairly and accurately the underlying reality of the

workplace." *Merillat v. Metal Spinners, Inc.*, 470 F.3d 685, 690 (7th Cir. 2006) (citation and quotations omitted). Accordingly, in a case where one or two positions are eliminated and job duties are absorbed by other employees (called a mini-reduction in force or "mini-RIF"), "the fourth prong of the *prima facie* case is met by showing simply that the plaintiff was 'constructively replaced,' in other words that his responsibilities were absorbed by employees not in the protected class." *Ritter v. Hill 'N Dale Farm, Inc.*, 231 F.3d 1039, 1043 (7th Cir. 2000); *see also Filar v. Bd. of Educ. of the City of Chicago*, 526 F.3d 1054, 1060 (7th Cir. 2008) ("the prima facie case in this context swaps the fourth requirement in the basic framework—that a similarly situated younger employee was treated more favorably—with another—that [his] duties were absorbed by younger workers who were retained following the mini-RIF").

Age discrimination can still exist when one's job duties are absorbed by an employee over 40 years old if that employee is "substantially younger" than the terminated person. *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 321-22 (7th Cir. 2003); *see also Wells v. EMF Corp.*, 757 F. Supp.2d 791, 801 (N.D. Ind. 2010) (applying this to a mini-RIF). The law defines substantially younger as "generally ten years younger." *Bladerston*, 328 F.3d at 322; *see also Tubergen v. St. Vincent Hosp. & Health Ctr.*, 517 F.3d 470, 475 n.4 (7th Cir. 2008) ("Under the ADEA, in the case of younger employees that fall above the age of forty, the age difference must be ten years or greater in order to be presumptively substantial.").

Mr. Torbica admits he cannot satisfy his *prima facie* case as his work was absorbed by an employee who was a member of his protected class who was not substantially younger (Ms. Gaboyan was 55 when she took over Mr. Torbica's territory when he was terminated at age 61). Instead, Mr. Torbica asks the court to consider the managers' ages and all the other evidence to conclude that SVP Najera was motivated by age to fire him.

Holistically, and without relying on *McDonnell Douglas*, a plaintiff may marshal evidence of intentional discrimination to overcome summary judgment. *Joll*, 953 F.3d at 929. Often "three broad

9

types of circumstantial evidence [] will support an inference of intentional discrimination: ambiguous or suggestive comments or conduct; better treatment of people similarly situated but for the protected characteristic; and dishonest employer justifications for disparate treatment." *Id.* (citing *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994)). The evidence, taken together, must "permit a reasonable jury to infer 'an overall likelihood of discrimination' that merits a trial, not summary judgment." *Id.* (citing *Ortiz*, 834 F.3d at 763).

First, Mr. Torbica says there is direct evidence that age was considered in determining whose position would be eliminated, but that isn't supported by the record. Mr. Torbica says managers' ages were expressly incorporated into Horizon's mini-RIF analysis, citing to 31-3 at page 3. This exhibit doesn't have a third page, and the two pages that were included don't say anything about age. Elsewhere, Mr. Torbica says the three managers' ages were listed in a supporting document that SVP Najera emailed to VP Pressinell on October 20, 2020, while discussing his restructuring proposal [31-7 at 3]. That the managers' ages and other biographical information like hire date, gender, and whether each is a member of a racial minority were listed does not allow a reasonable jury to find that Horizon fired Mr. Torbica because of his age. "Knowledge of a worker's age does not support an inference of age discrimination[.]" *Gustovich v. AT&T Commc'ns, Inc.*, 972 F.2d 845, 849 (1992).

In turning to circumstantial evidence, Mr. Torbica says SVP Najera made his bias against older employees known by repeatedly asking Mr. Torbica about his retirement plans despite knowing that he intended to work for another ten years. Mr. Torbica testified that SVP Najera "had consistently asked me when I was going to retire" even after he "had made it clear, both to him privately, personally, and publicly" that he planned to retire several years after his then-college-aged son finished pharmacy school [31-27 Tr. 84-85]. Mr. Torbica specifically recalled the language he used: "at age 70, I'll be on the beach" [31-27 Tr. 85]. SVP Najera denies this and says he never asked Mr. Torbica or any other Horizon

employee when they planned to retire [29-3 Tr. 66], but the court must take all reasonable inferences in Mr. Torbica's favor at summary judgment.

Additionally, Mr. Torbica says SVP Najera made comments in meetings with the sales managers that "the ways to get rid of people is to have them quit, or retire, or you can manage them out" [31-27 Tr. 105]. SVP Najera "wasn't telling us to do it. He was saying that's how you do it" [31-27 Tr. 106]. Further, Mr. Torbica said that SVP Najera "had on many occasions asked me to call some of my elderly mortgage loan originators and ask them when they were going to retire. One's Mary Brska, one's John Khalil. So on his instruction, he would call me and say, please call them and say, what are their plans, how long do they plan on working" [31-27 Tr. 84-85].

Even taking Mr. Torbica's deposition testimony as true, evidence of retirement inquiries generally is not indirect evidence of age discrimination. "A company has a legitimate interest in learning its employees' plans for the future, and it would be absurd to deter such inquiries by treating them as evidence of unlawful conduct." *Colosi v. Electri-Flex Co.*, 965 F.2d 500, 502 (7th Cir. 1992); *see also Pitasi v. Gartner Grp., Inc.*, 184 F.3d 709, 715 (7th Cir. 1999) (employer's "suggestion of retirement would not alone give rise to an inference of discrimination"). Furthermore, "isolated comments that are no more than 'stray remarks' in the workplace are insufficient to establish that a particular decision was motivated by discriminatory animus." *Merillat*, 470 F.3d at 694. Stray remarks can provide the inference of discrimination when the remarks were made by the decisionmaker, around the time of the decision, and in reference to the employment action, *see Teruggi v. CIT Grp./Cap. Fin., Inc.*, 709 F.3d 654, 661 (7th Cir. 2013), but those aren't the facts here.

The remarks that Mr. Torbica highlights were made by SVP Najera, but he was not the final decisionmaker on the restructuring. Mr. Torbica relies on SVP Najera's deposition that says he conducted the analysis and made a recommendation that President Neff, VP Pressinell, and CEO Dwight endorsed and carried out [31-28 Tr. 62]. Though SVP Najera recommended that Horizon eliminate Mr. Torbica's

11

position, it was President Neff, VP Pressinell, and CEO Craig Dwight who made the final decision [31-28 Tr. 62]. "Normally, statements by a nondecisionmaker do not satisfy a plaintiff's burden of proof in an employment discrimination case," *Paluck v. Gooding Rubber Co.*, 221 F.3d 1003, 1010 (7th Cir. 2000), though statements by "someone with influence over the decision" may support an inference of discrimination, *see Seymour-Reed v. Forest Pres. Dist.*, 752 F. Appx. 331, 335 (7th Cir. 2018). SVP Najera certainly influenced the decision as he provided his plan to the decisionmakers who adopted it. None of the remarks that Mr. Torbica highlights, though, were made around the time of the decision or in reference to the 2021 termination. Although someone with influence over the decision made stray comments about retirement previously, this alone does not allow a reasonable jury to find that Horizon fired Mr. Torbica *because of* his age. *See Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 605 (7th Cir. 2012) ("[I]solated comments are not probative of discrimination unless they are contemporaneous with the discharge or causally related to the discharge decision-making process.") (citations and quotations omitted).

Mr. Torbica also tries to present circumstantial evidence of better treatment of people similarly situated. *Joll*, 953 F.3d at 929. He says Ms. Gaboyan was treated better by SVP Najera because he responded to her emails more promptly than those of Mr. Torbica, but he doesn't identify any better treatment of people similarly situated but for the protected characteristic. Ms. Gaboyan was also over the age of 40 and thus in his protected class. He similarly says Ms. Gaboyan and Mr. Simmons were paid more than he was and that he was given a worse geographic region, but neither individual is outside his protected class.

Taken together, the evidence does not "permit a reasonable jury to infer 'an overall likelihood of discrimination' that merits a trial." *Joll*, 953 F.3d at 929 (citing *Ortiz*, 834 F.3d at 763). Discrimination can be shown holistically or through the traditional burden-shifting framework of *McDonnell Douglas*, but Mr.

Torbica has satisfied neither. Accordingly, the court grants summary judgment on the age discrimination claim.

    B.   *National Origin and Religious Discrimination.*

Title VII prohibits employers from discriminating against their employees on the basis of national origin or religion. 42 U.S.C. § 2000e-2(a). When an employee's position is eliminated as part of a mini-reduction in force, the mini-RIF *McDonnell Douglas* framework can be used for a Title VII claim. *See Petts v. Rockledge Furniture LLC*, 534 F.3d 715, 725 (7th Cir. 2008).

Mr. Torbica says he was discriminated against because he is Serbian and Eastern Orthodox. He uses the *McDonnell Douglas* mini-RIF framework as Ms. Gaboyan absorbed his job duties. First, Mr. Torbica, as Serbian and Eastern Orthodox, is a member of a protected class [31-27 Tr. 9-10]. Second, Mr. Torbica met Horizon's legitimate expectations, as shown by SVP Najera's testimony that he was not terminated based on performance [31-28 Tr. 105], aside from his meets-expectations reviews. Third, his employment was terminated [31-13]. Fourth, his duties were absorbed by Ms. Gaboyan who is neither Serbian nor Eastern Orthodox [31-27 Tr. 110-111]. Mr. Torbica has satisfied his burden under the mini-RIF *McDonnell Douglas* test. *See Michas v. Health Cost Controls of Illinois, Inc.*, 209 F.3d 687, 693 (7th Cir. 2000).

When a plaintiff establish a *prima facie* case, as here, a rebuttable presumption of discrimination is created. The burden of production then shifts to the defendant to articulate a legitimate, non-discriminatory reason for its adverse employment decision. *See McDaniel*, 940 F.3d at 368. Horizon says it eliminated Mr. Torbica's position as a cost-saving business decision based on objective criteria using the geographic location and the 2018-2020 production numbers of each sales manager [29-3 Tr. 165]. This is a legitimate, non-discriminatory reason supported by the record.

Once the defendant produces a legitimate reason, the presumption dissolves and the burden then shifts to the plaintiff to show that defendant's proffered reason is pretext and that defendant's actual

reason was discriminatory. *See McDaniel*, 940 F.3d at 368. "Pretext … means a lie, specifically a phony reason for some action." *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995). An employee may establish pretext indirectly by proving one of the following: "(1) [the] explanation [] had no basis in fact, or (2) the explanation was not the 'real' reason, or (3) . . . the reason stated was insufficient to warrant the [adverse job action]." *Lenoir v. Roll Coater, Inc.*, 13 F.3d 1130, 1133 (7th Cir. 1994). The question in a pretext inquiry is not whether the employer's stated reason was inaccurate or unfair; instead, the question is whether the employer honestly believed the reason it gave for the adverse action. *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 565 (7th Cir. 2015). "[I]t is not the court's concern that an employer may be wrong about its employee's performance or be too hard on its employee. Rather, the only question is whether the employer's proffered reason was pretextual, meaning that it was a lie." *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 724 (7th Cir. 2018) (quotations and citations omitted).

Mr. Torbica says SVP Najera's cost-saving explanation is pretext because SVP Najera knew the mortgage business was booming in 2020 and because the managers eventually exceeded their 2019 production numbers in 2020. When SVP Najera conducted his 2020 midyear review of the managers, Mr. Torbica's and Mr. Simmons's production numbers already exceeded those from 2019 and Ms. Gaboyan's production was over 80 percent of her 2019 figure [31-9 at 6 (Ms. Gaboyan produced $170,343,579 by mid-2020), 31-12 at 6 (Mr. Torbica produced $137,383,281 by mid-2020); 31-11 at 7 (Mr. Simmons produced $55,800,000 by mid-2020)]. Mr. Torbica says SVP Najera knew about this growth and intentionally omitted it from his restructure analysis [31-28 Tr. 29-30], but that's only half the story.

SVP Najera knew that the 2020 midyear numbers were an uptick of the previous year [31-28 Tr. 30], but he didn't anticipate further growth due to the uncertainty of the COVID-19 pandemic. SVP Najera said Horizon "didn't know" what was going to happen to the production numbers [31-28 Tr. 31]. "We were in a pandemic. So they were moving up, but we didn't anticipate the growth that we saw in

14

[2021]" [31-28 Tr. 31]. The decision to cut a sales manager position may seem unwise in perfect hindsight when considering that the mortgage industry continued to boom through much of the pandemic, but it is not the court's "role to question the wisdom of a company's decisions on how to run its business, only to assure that such decisions are not intended to provide cover for illegal discrimination." *Johal v. Little Lady Foods, Inc.*, 434 F.3d 943, 946-47 (7th Cir. 2006). A reasonable jury could not find that Horizon's cost-saving reason was a lie or phony reason.

Next, Mr. Torbica argues that the cost-saving explanation was pretextual because he was the sales manager with the lowest commission rate so if Horizon really wanted to cut costs it would have cut a position with a higher commission rate. This argument fails to grasp Horizon's reason for terminating Mr. Torbica's position—that it was a cost-saving measure based on objective criteria using the geographic location and the production numbers of each sales manager. Horizon didn't claim to just cut the least expensive position in an effort to save money.

Mr. Torbica also argues his performance was objectively better than that of Mr. Simmons. But it is the decisionmakers' perception of his performance—not Mr. Torbica's perception—that matters. *See Adreani v. First Colonial Bankshares Corp.*, 154 F.3d 389, 398 (7th Cir. 1998) ("[Plaintiff] attempts to raise issues of material fact based on his own perceptions of his performance. However, it is the perception of the decisionmaker, not the employee, that is relevant."). Although Mr. Torbica attempts to cast this as a decision between him and Mr. Simmons, SVP Najera determined that the decision was actually between Ms. Gaboyan's and Mr. Torbica's positions after factoring in the geographic considerations [31-28 Tr. 65]. Between the two, SVP Najera thought that the decision was "very, very clear, as far as production and numbers and what they brought to the organization" and that they should keep Ms. Gaboyan's position [31-28 Tr. 65]. Mr. Torbica seems to concede that Ms. Gaboyan outperformed him as he doesn't argue that her position should have been the one terminated.

15

Mr. Torbica also takes issue with SVP Najera's explanation that Mr. Simmons' role was not considered for elimination due to his unique market. Mr. Torbica says Horizon hasn't explained what made the Central/Southern Indiana market unique, but that isn't the case. SVP Najera testified that Horizon wanted to expand in that market [31-28 Tr. 35] and that Mr. Simmons "had various connections in the Indianapolis market" with realtors and builders [31-28 Tr. 36-37]. That Mr. Torbica had once covered a portion of the territory doesn't make Mr. Simmons' connections less valuable or make Horizon's explanation pretext.

Mr. Torbica also attempts to show pretext by concluding that SVP Najera's testimony that the bank "wanted to expand in [Mr. Simmons's] market" [31-28 Tr. 35] contradicts his testimony that he was initially promoted "to maintain the balances, not to grow" because Horizon was "very happy with the level of the portfolio size" [31-28 Tr. 28]. These aren't contradictory statements as the growth references one territory whereas the portfolio size references Horizon's entire market. And business goals change sometimes. That Horizon's goal changed from maintenance in July 2019 when SVP Najera was hired to growth in mid-2020 when the restructuring conversations occurred doesn't demonstrate to a reasonable jury that Horizon's reasons for eliminating Mr. Torbica's position were pretextual.

Finally, Mr. Torbica says SVP Najera used deceit to cover his tracks by falsely tying his termination decision to 2020's year-end budget process when he initially raised the possibility of eliminating a sales manager position in March 2020. He says this is a systematic abandonment of Horizon's annual budgeting process that points to an unlawful motive. SVP Najera testified that he decided there didn't need to be three sales managers during the budgeting process of 2020, which occurred from October to December 2020 [31-28 Tr. 23-24]. However, he also testified that he first began to suspect that perhaps three managers were more than was needed when he started to review Horizon's business and production plans in early 2020 before the pandemic hit. [31-28 Tr. 24-25 ("[n]ot realizing the pandemic was, you know, up ahead.")]. Even if this testimony isn't consistent with the March

2020 memorandum that Mr. Torbica points to ("recommending that [a] current MLO Sales Manager position be eliminated effective immediately"), Mr. Torbica doesn't demonstrate how it rises to the level of pretext. *See Groves v. S. Bend Cmty. Sch. Corp.*, 51 F.4th 766, 770 (7th Cir. 2022) ("identifying an inconsistency (or even a lie) is not necessarily sufficient to prove that the employer's rationale was pretext for discrimination"). Mr. Torbica hasn't shown that Horizon's proffered reason for eliminating his position is "a lie rather than an oddity or an error." *Everroad v. Scott Truck Sys.*, 604 F.3d 471, 479 (7th Cir. 2010).

Mr. Torbica claims that this business decision was motivated not by a decision to cut costs based on objective criteria, but by discriminatory animus based on his national origin and religion. But he presents no evidence from which a reasonable jury could find such animus or any evidence that would tend to disprove that Horizon was motivated by a desire to cut costs. Mr. Torbica has not demonstrated a triable issue as to Horizon's legitimate business motive for eliminating his position. The law emphasizes that "in assessing a plaintiff's claim that an employer's explanation is pretextual, [the court does] not sit as a 'super personnel review board'" and "second gues[s] an employer's facially legitimate business decisions." *Argyropoulous v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008) (quoting *Culver v. Gorman & Co.*, 416 F.3d 540, 547 (7th Cir. 2005)). The law won't permit a personnel review board today. Accordingly, the court grants summary judgment on the national origin and religion discrimination claims.

CONCLUSION

Accordingly, the court GRANTS Horizon's summary judgment motion [27]. This order terminates the case.

SO ORDERED.

November 2, 2023                             *s/ Damon R. Leichty*
                                             Judge, United States District Court